**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| Diektrich M.,[1] | § | |
|     *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action H-24-4578 |
| | § | |
| Frank J. Bisignano,[2] | § | |
| Commissioner of the Social | § | |
| Security Administration, | § | |
|     *Defendant*. | § | |

**MEMORANDUM AND RECOMMENDATION**

Diektrich M. appeals the Social Security Administration Commissioner's final decision denying his application for Social Security benefits. ECF No. 1. This case has been referred to the undersigned magistrate judge for all pretrial purposes. ECF No. 7. Pending before the court are Diektrich's Motion for Summary Judgment, ECF No. 11, and the Commissioner's Cross-Motion for Summary Judgment, ECF No. 19. The court recommends that Diektrich's Motion for Summary Judgment be **DENIED**, and that the Commissioner's Cross-Motion for Summary Judgment be **GRANTED**. Accordingly, the court recommends that the Commissioner's final decision be **AFFIRMED**.

---

[1] In light of guidance received from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which states that there are significant privacy concerns in social security cases, the court refers to the Plaintiff only by their first name and last initial.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Frank J. Bisignano is substituted as the defendant in this suit.

### 1. *Procedural Posture*

On January 18, 2019, Diektrich filed an application for disability insurance benefits (DIB) and Medicare Qualified Government Employee (MQGE) benefits, under Title II of the Social Security Act (Act). Tr. 183–84. Diektrich alleged that his disability began on December 31, 2015, due to major depressive disorder, anxiety, radiculopathy, and degenerative joint disease. *Id.*; Tr. 109. Because of Diektrich's work history, in order to qualify for both DIB and MQGE benefits, Diektrich must establish disability on or before December 31, 2021 (the date he was last insured). Tr. 583. If Diektrich were only able to establish disability after the December 31, 2021, but before December 31, 2022, he would qualify solely for MQGE benefits. *Id.*

The SSA denied Diektrich's application at the initial level on April 25, 2019, and upon reconsideration on June 20, 2019. Tr. 85–94, 110–13, 96–107, 118–20. Administrative Law Judge (ALJ) William Sharp held a hearing on March 17, 2020, and found that Diektrich was not disabled under the Act during the relevant period. Tr. 10. The Appeals Council (AC) affirmed ALJ Sharp's decision. Tr. 1. Diektrich appealed to federal court, and the case was remanded to the Commissioner for further consideration. *See Diektrich M. v. Kijakazi*, No. 20-2555, 2021 WL 6072594 (S.D. Tex. Dec. 23, 2021), *R. & R. adopted*, 2022 WL 74333 (S.D. Tex. Jan. 7, 2022).

On September 13, 2022, ALJ Sharp held a second hearing. Tr. 608. Again, ALJ Sharp determined that Diektrich was not disabled under the Act during the relevant period. Tr. 769–70. Upon review, the AC found that ALJ Sharp had not sufficiently considered the medical evidence. Tr. 781–83. Because ALJ Sharp had twice held hearings on Diektrich's claim, the AC remanded the case to a different ALJ to conduct another hearing. *Id.*

ALJ Daniel Whitney held the third hearing on Diektrich's claim by video on March 20, 2024. Tr. 636. Diektrich's counsel was present at the hearing. *Id.* Diektrich testified about his work history, education, military experience, and medical conditions. Tr. 639–66.

As to his work history, Diektrich testified that his most recent job was in 2017. Tr. 642–44. At that time, he worked for Bryan Independent School District as a teacher's aide. *Id.* He stated that in that role, he would "counsel" students and function as a "behavior specialist." *Id.* Diektrich explained that prior to that role, from 2011 to 2016, he worked at Blinn College. Tr. 642. First, as a full-time veterans' financial aid coordinator, and then, for a brief period, as a part-time shuttle driver. *Id.* From 2009, until he was hired at Blinn College, Diektrich worked as a parking enforcement officer for Texas A&M University. Tr. 641–42.

A Vocational Expert (VE) testified about Diektrich's past work. As classified by the Dictionary of Occupational Titles (DOT), Diektrich's job as a parking lot enforcement officer is an unskilled (SVP 2), light exertion position. Tr. 644. His prior job as a veterans' coordinator is a skilled (SVP 6), light exertion position. *Id.* And Diektrich's prior job as a teacher aide is a semi-skilled (SVP 3), light exertion position. *Id.*

After the VE classified Diektrich's prior jobs, Diektrich testified about his education, as well as his experience in the military. Tr. 645. Diektrich stated that he graduated high school. *Id.* He enlisted in the Army from 1997 to 2002. *Id.* He explained that he was deployed to California and Louisiana during that time. Tr. 645–46. He testified that in approximately 2020, the Department of Veterans Affairs (VA) declared him 100% disabled due to his medical conditions. Tr. 647.

As to his mental condition, Diektrich testified that he suffers from depression, anxiety, suicidal thoughts, and audio and visual

hallucinations. Tr. 647, 655–57. Diektrich explained that his mental health affects him in various ways. Tr. 653–57. He stated that while he was a veterans benefits coordinator, he had difficulty focusing and concentrating because he "was under so much pressure." Tr. 653–54. He said that he would lash out in anger, and his ability to perform his job declined. Tr. 654. He was terminated from the job as a result. Tr. 658–59. Diektrich explained that he has trouble sleeping because he has nightmares related to his experiences in the military. Tr. 646–47, 655–56. Those experiences included Diektrich witnessing fellow servicemen being killed by explosives, and, in a separate incident, in a helicopter crash. *Id.* While he is prescribed medication for his mental health conditions, Diektrich testified that that he still experienced symptoms. Tr. 655–57.

As to his physical condition,[3] Diektrich testified that he had joint displacement in his hip and sciatic nerve damage, and that he experienced chronic pain in his back and left knee. Tr. 647, 650–51. He explained that those conditions prevented him from sitting or standing for extended periods of time. *Id.* He stated that he used a cane, back brace, and knee brace to walk, which had been prescribed for him by the VA. Tr. 649, 652. At home, he used a hot pad and a TENS unit to manage his pain Tr. 652–53. Additionally, Diektrich testified that he had diabetes, high blood pressure, and high cholesterol. Tr. 650. He took medications to manage his physical and mental conditions. Tr. 650.

On a regular day without work, Diektrich said that he would stay at home, sit on the couch, watch TV, and read the Bible and other books. Tr. 648. He testified that he was not able to do the

---

[3] The court notes that the parties do not argue that the ALJ erred in connection with any of Diektrich's physical impairments. This case is focused on whether the ALJ erred with respect to his mental impairments.

home-exercises that he had been given by his chiropractor and physical therapist. Tr. 649.

The ALJ presented a series of hypotheticals to the VE, and Diektrich's lawyer cross-examined the VE. The VE testified about a hypothetical claimant, described as a person of Diektrich's same age, education, and work experience, who was limited to performing only simple and non-production rate paced jobs, involving a maximum of six hours of sitting and six hours of standing and walking; occasionally lifting twenty pounds and frequently lifting ten pounds; occasionally climbing, but never climbing ladders, ropes, and scaffolds; frequently stooping and crouching. Tr. 661. The VE responded that such a hypothetical claimant would be able to perform Diektrich's past work as a parking lot enforcement officer, but not as a teacher's aide. *Id.* The VE testified that such a person would also be capable of working in the unskilled positions of marker, officer helper, and router, as those positions are described in the DOT. *Id.*

On cross-examination, Diektrich's lawyer posed one question to the VE about the number of unscheduled absences from work an individual could have while still being able to sustain employment. Tr. 663. The VE answered that an individual cannot have more than two unscheduled absences from work per month. *Id.* Then, in closing, Diektrich's lawyer summarized Diektrich's alleged impairments, citing to specific documents in the record. Tr. 664–65.

The ALJ issued his decision on April 24, 2024, finding that Diektrich was not disabled from December 31, 2015, through December 31, 2022. Tr. 583. Diektrich requested review of the ALJ's decision, which the Appeals Council denied on September 16, 2024. Tr. 570. Diektrich timely filed a complaint in federal court on November 20, 2024. ECF No. 1.

5

### *2. Legal Standards*

The Social Security Act provides disability insurance benefits to individuals with physical and mental disabilities who have contributed to the program and were disabled "on or before the date . . . last insured." *See* 42 U.S.C. § 423; *Schofield v. Saul*, 950 F.3d 315, 319 (5th Cir. 2020). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a sequential, five-step approach to determine whether the claimant is disabled. *See Schofield*, 950 F.3d 315, 317 (5th Cir. 2020); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden on the fifth step. *See Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). A finding that the claimant is disabled or not disabled at any point in the five-step review terminates the analysis. 20 C.F.R. § 404.1520(a)(4).

This court's "review of the ALJ's [disability] determination is highly deferential," *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018) (citations omitted). The court "ask[s] only whether substantial evidence supports the decision and whether the correct legal standards were employed." *Id.* "A decision is supported by substantial evidence if 'credible evidentiary choices or medical findings support the decision.'" *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance.'" *Id.* (quoting *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004)). "It means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v.*

*Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The reviewing court must scrutinize the record to determine whether substantial evidence supports the ALJ's decision, but it may not reweigh the evidence or substitute its judgment. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

### 3. Analysis
#### A. Step One

At step one, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). A person engaged in substantial gainful activity is not disabled, regardless of their medical condition, age, education, or work experience. 20 C.F.R. § 404.1520(b).

The ALJ found that Diektrich did not engage in substantial gainful activity from his alleged onset date through the date he was last insured. Tr. 585. The record showed that while Diektrich earned some wages in 2016 and 2017 as a MQGE, his income did not exceed the substantial gainful activity threshold during the relevant period. *Id.* This finding is not in dispute.

#### B. Step Two

At step two, the ALJ determines whether any of the claimant's impairments, or any combination thereof, is severe and has lasted, or is expected to last, a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii) (citing 20 C.F.R. § 404.1509). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). An impairment is "not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience." *Keel*, 986 F.3d at 555 (quoting *Stone v. Heckler*,

7

752 F.2d 1099, 1101 (5th Cir. 1985)). "A person who does not have a 'severe impairment' is not disabled." *Schofield*, 950 F.3d at 318 (citing 20 C.F.R. § 404.1520(c)).

Through the date Diektrich was last insured, the ALJ found that Diektrich had severe impairments of "Degenerative Disc Disease of the Cervical and Lumbar Spine; Osteoarthritis of the Knees; Right Shoulder Impingement; Obesity; Bipolar/Depressive Disorder; and Anxiety/Post-Traumatic Stress Disorder . . . ." Tr. 585. The ALJ's findings are supported by substantial evidence and are not in dispute.

### C. Step Three

At step three, the ALJ determines if any of the claimant's severe impairment meets or equals a listed impairment (Listing) in Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Listings describe impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. § 404.1525(a). The claimant will be found disabled if the claimant's impairments meet or equal all of the specified criteria of a Listing. 20 C.F.R. § 404.1520(d); *Whitehead*, 820 F.3d at 781. The claimant has the burden of establishing that their impairments match the Listing. *Whitehead*, 820 F.3d at 781.

The ALJ considered Listing Sections 1.15, 1.16, 1.18, 12.04, 12.06, and 12.15, in combination with Social Security Ruling (SSR) 19-2p (Evaluating Cases Involving Obesity). Tr. 586. The ALJ determined that Diektrich did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listings. *Id.* Diektrich does not dispute this finding.

Although "[o]bseity is not a listed impairment," it may cause functional effects that may increase the severity or functional

limitations of the individual's other impairments. SSR 19-2p, 2019 WL 2374244 (May 20, 2019). "No specific weight or BMI establishes obesity as a 'severe' or 'not severe' impairment." *Id.* Instead, an ALJ must assess "the effect of obesity on a person's functioning when deciding whether the impairment is severe." *Id.* In Diektrich's case, the ALJ noted that "obesity is often associated with musculoskeletal, respiratory, cardiovascular, and endocrine disorders[,] and [it] increases the risk of developing other impairments in these body systems." Tr. 588. Accordingly, the ALJ considered the effect of obesity on his other physical and mental impairments, singly and in combination. Tr. 589.

The ALJ determined that Diektrich's musculoskeletal impairments did not meet or equal the severity of impairments in Listing Sections 1.15, 1.16, or 1.18 through the date he was last insured. Tr. 587. Diektrich's medical records did not reflect a medical need for a walker, bilateral canes, or crutches, or other mobility device that requires the use of both hands. *Id.* Additionally, the record did not demonstrate that Diektrich is incapable of using one arm to independently initiate, sustain, and complete work-related activities involving fine and gross movements, while using his other arm to operate a mobility device or other hand-held assistive device. *Id.* The record also did not show that Diektrich has the inability to use both of his arms such that neither arm could be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements. *Id.*

The ALJ also determined that Diektrich's mental impairments, considered singly and in combination, did not meet or equal the severity of impairments in Listing Sections 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders) because Diektrich did not satisfy the "paragraph

B" or the "paragraph C" criteria. Tr. 588–89. To be found disabled at step three, the claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. Listing § 12.00(A)(2). A claimant who does not satisfy either of paragraphs B or C cannot meet or equal the severity of impairments in the Listings in Section 12.

The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." Listing § 12.00(A)(2)(b). Those areas are the claimant's ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* The ALJ must evaluate the claimant's ability to function in each of the four areas using this five-point rating scale:

a. No limitation (or none). [Claimant is] able to function in this area independently, appropriately, effectively, and on a sustained basis.

b. Mild limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

c. Moderate limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

d. Marked limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

e. Extreme limitation. [Claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis.

Listing § 12.00(F)(2). To meet the paragraph B criteria, a claimant's disorder must result in an "extreme" limitation in one or a "marked" limitation in two of the four areas of mental functioning. *Id.* The ALJ found that Diektrich had only mild or moderate limitations in each of the four areas. Tr. 588–89.

10

As for understanding, remembering, or applying information, the ALJ determined that Diektrich had a mild limitation. Tr. 588. The ALJ noted that Diektrich's medical records reflect that he is cognitively intact with linear, logical, and goal-directed thought processes. *Id.* (citing Tr. 430, 436, 1576, 1611, 1683–84, 1728, 1737). The ALJ stated that the first two State Agency Psychological Consultants (SAPCs) who evaluated Diektrich's records found that he was not limited in this area, while the second two SAPCs found a mild limitation. *Id.* (citing Tr. 90, 102, 698, 718). The ALJ found that Diektrich "is not particularly limited in this area of function." *Id.*

As for interacting with others, the ALJ determined that Diektrich had a mild limitation, but he noted that "it was closer to moderate than none." Tr. 588. The ALJ acknowledged that Diektrich testified to having some difficulty interacting with others, particularly in crowds, which is consistent with his own reports to medical providers. *Id.* (citing Tr. 436 and Hearing Testimony). However, the ALJ noted that his medical records from 2019 showed that he was cooperative and friendly with good eye contact. *Id.* (citing Tr. 359, 430, 436). The ALJ observed that Diektrich's medical records reflected his self-reported anger problems. *Id.* (citing Tr. 521). But his mental status examinations at the VA in 2021 and 2022 continued to indicate that Diektrich was cooperative, friendly, and engaged, and that he exhibited good eye contact and normal speech. *Id.* (citing Tr. 1576, 1611, 1683, 1737). The ALJ considered the fact that Diektrich's mood was described in the records as "dysphoric" to "euthymic most days," with congruent affect. *Id.* (citing Tr. 1611, 1737). He noted that Diektrich's records reflected that he had "good social support." *Id.* (citing Tr. 1686). The first two SAPCs determined that Diektrich had a mild limitation in this area of function, while the second two found a moderate limitation. *Id.* (citing Tr. 90, 102, 698, 718). The

11

ALJ concluded that a mild limitation best reflected Diektrich's "consistently cooperative, friendly attitude" with no "indication of significant interpersonal conflict." *Id.*

As for concentrating, persisting, or maintaining pace, the ALJ determined that Diektrich had a moderate limitation. Tr. 588. The ALJ acknowledged that Diektrich testified to having difficulty concentrating. *Id.* However, the ALJ noted that his medical records reflect that his attention and concentration were intact, and that his "thought content contained no abnormalities," such as suicidal or homicidal ideation, hallucinations, or delusions, which, if present, might have interfered with Diektrich's concentration, persistence, or ability to maintain pace. *Id.* (citing Tr. 1576, 1611, 1737). The ALJ considered that Diektrich participated during his evaluation, which resulted in his attention and concentration being deemed "fair." Tr. 588–89 (citing Tr. 1612, 1683–84, 1738). The first two SAPCs determined that Diektrich had a mild limitation in this area of function, while the second two found a moderate limitation. Tr. 589 (citing Tr. 90, 102, 698, 718).

As for adapting or managing oneself, the ALJ determined that Diektrich had a mild limitation. Tr. 589. The ALJ noted that Diektrich's mental status examinations indicated that he was casually/well-dressed and well-groomed, and that he exhibited good-to-fair insight and no impairment to his judgment. *Id.* (citing Tr. 1576, 1611, 1737). The first two SAPCs determined that Diektrich had a mild limitation in this area of function, while the second two found a moderate limitation. *Id.* (citing Tr. 90, 102, 698, 718). The ALJ noted that Diektrich had experienced a moderate limitation in this area, as indicated by the second two SAPC opinions, but that Diektrich's function in this area was stable with treatment. *Id.* (citing Tr. 429–41, 1540–87, 1625–1750). Accordingly, the ALJ found a mild limitation. *Id.*

Because Diektrich did not have at least two "marked" limitations or one "extreme" limitation in the four areas of mental functioning, the ALJ determined that he did not satisfy the paragraph B criteria. Tr. 589.

The ALJ also determined that Diektrich failed to satisfy the paragraph C criteria because the evidence did not show that his mental impairments were "serious and persistent"—that is, his impairments did not exist over a period of at least two years, accompanied by evidence of ongoing medical treatment that diminished the symptoms of his mental disorders, plus marginal adjustment. Tr. 589; *see also* Listing § 12.00(G)(2) (explaining the paragraph C criteria).

The ALJ's step-three determination is supported by substantial evidence and comports with the law. The step three findings are not directly in dispute, although Diektrich maintains that the ALJ did not consider his own step three findings in formulating the RFC, which is discussed below. Diektrich does not point out any evidentiary or legal error in the ALJ's step three findings. The ALJ specifically cites portions of the record in making his step three findings. Having reviewed the record and the briefing, the court detects no error—legal or factual.

### D. Residual Functional Capacity

Before reaching the final two steps, the ALJ must assess the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e) (citing 20 C.F.R. § 404.1545). The RFC is a determination of the most a claimant can do despite all physical and mental limitations. *Perez*, 415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)). The RFC determination is based on "the medical evidence in the record, including the testimony of physicians and the claimant's medical records." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021). "An 'ALJ is responsible for determining an

applicant's residual functional capacity.'" *Id.* (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)); *see also* 20 C.F.R. § 404.1546(c).

The ALJ determined that, thorough the date Diektrich was last insured, Diektrich had the RFC to perform light work, limited to occasionally climbing ladders, ropes, and scaffolds; frequent stooping and crouching; and understanding, remembering, and carrying out simple tasks with no production rate pace jobs (such as an assembly line). Tr. 589.

In making this determination, the ALJ considered the entire record, including Diektrich's hearing testimony and statements he made to medical providers, the medical records, and the various statements and opinions of Diektrich's medical providers. Tr. 589–90.

As for Diektrich's statements at the hearing and to medical providers, the ALJ's summary of those statements is consistent with Diektrich's hearing testimony, which the court summarized above. Essentially, Diektrich maintains that he is extremely limited physically and mentally. He does very little other than watch television and read while on the couch. He cannot exercise.

Diektrich has a history of mental problems including depression related to chronic pain, bipolar disorder, PTSD, and anxiety. Tr. 592. He reported to his medical providers that his symptoms improved with medication. *Id.* (citing Tr. 1375). His clinical evaluations showed him to be cooperative and engaged, with good eye contact, normal speech, a stable mood and logical and goal-directed thoughts processes. *Id.* There were no indications of hallucinations or delusions. *Id.* He had intact memory, and fair concentration, judgment, and insight. *Id.* (citing Tr. 1683–84).

The ALJ found that, while Diektrich's medically determinable impairments could reasonably be expected to cause

14

his alleged symptoms, his statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence. Tr. 592. The court turns next to an analysis of that finding.

The ALJ considered that Diektrich's obesity may have worsened his physical limitations. Tr. 591. He explained that Diektrich's RFC "reflects the effect obesity has upon [his] ability to perform routine movement and necessary physical activity within the work environment." Tr. 587–88. As to Diektrich's physical limitations, the ALJ stated that his physical exams "have demonstrated some abnormalities, but they are not severe." Tr. 591. The ALJ acknowledged that Diektrich's medical records reflect his complaints of neck pain and chronic back pain. Tr. 590. The ALJ also noted that Diektrich's imaging records from 2017 reflect spinal disc protrusions, some disc and joint degeneration in his cervical and lumbar spine, and mild lumbar spondylosis. *Id.* Additionally, the ALJ noted that in the summer of 2021, Diektrich was diagnosed with a right shoulder impingement, and a subsequent MRI of his shoulder showed "only mild" degenerative changes. Tr. 591. The ALJ also acknowledged that despite these physical abnormalities and injuries, Diektrich's clinical evaluations have shown that his range of motion of his spine, neck, back, and shoulder are within functional limits, despite some pain in his back and shoulder at the top of his range of motion. Tr. 590–91. The ALJ stated that Diektrich has received a variety of treatments for his physical impairments, including epidural steroid injections, prescription medications, and physical therapy. *Id.* The ALJ observed that Diektrich repeatedly reported improvement after undergoing physical therapy for his shoulder and back. Tr. 591. The ALJ noted that in September 2020, Diektrich's doctor reported that his "back symptoms have not interfered with his activities of daily living." Tr. 592

The ALJ noted that Diektrich had reported pain in both knees during medical treatment, but his medical records did not reflect any radiological imaging of his knees or a diagnosis reflecting knee problems. Tr. 592. The ALJ also observed that physical examinations of Diektrich's extremities have not shown "cyanosis, edema, or clubbing," and his respiratory and cardiovascular examinations have been normal. *Id.*

Although Diektrich testified that he has trouble walking, and that he has been using a cane for six or seven years—prior to the date he was last insured. Tr. 592. However, the ALJ cited medical records from January 2018, February 2020, June 2020, and December 2023 reflecting that Diektrich demonstrated normal, stable gait without the need for a cane, brace, or other assistive device. *Id.* The ALJ observed that Diektrich does not have a prescription for an assistive device. *Id.* The ALJ also noted that Diektrich did not mention using a cane at his SSA hearings in 2020 and 2022. *Id.* The ALJ noted that the VA provided Diektrich with knee braces at Diektrich's own request, which Diektrich wore "some of the time." *Id.*

In terms of mental limitations, the ALJ concluded that the evidence did not reflect the severity of mental health symptoms that Diektrich alleged. Tr. 593. While Diektrich testified to hearing voices, the ALJ pointed out that Diektrich's medical records showed that he repeatedly denied auditory and visual hallucinations or delusions, and there was no evidence of such symptoms in his clinical evaluations. *Id.* (citing Tr. 430, 437, 454, 518, 555, 1376, 1683, 2172). The ALJ acknowledged that Diektrich's medical records reflected that he had a history of depression related to chronic pain, bipolar disorder, PTSD, and anxiety. Tr. 592 (citing Tr. 359, 382, 430, 436, 500, 556, 1311, 1371, 1570). The ALJ noted, however, that Diektrich's mental health was stable with treatment. Tr. 593 (citing Tr. 430–31, 437–38,

16

454–55, 518, 522, 555, 1376, 1576, 1683–84). In January 2021, Diektrich reported that his symptoms improved with medication, and in May 2022, he reported that, even though his back pain made him irritable at times, his PTSD and anxiety were under good control with medication. *Id.* (citing Tr. 1375, 1678). The ALJ observed that clinical evaluations consistently showed that Diektrich "was cooperative and engaged with good eye contact, normal speech, a euthymic (stable) mood, a logical and goal-directed thought process, no indication of hallucinations or delusions, intact memory, and fair concentration, judgment, and insight." *Id.* (citing Tr. 430–31, 437–38, 454–55, 518, 522, 555, 1376, 1576, 1683–84).

The ALJ also reviewed the opinions and prior administrative findings in the record. The ALJ addressed the opinion of Dr. Juan Gonzalez, who is Diektrich's treating psychiatrist at the VA. On February 7, 2020, Dr. Gonzalez filled out a survey at the request of Diektrich's attorney. Tr. 593 (citing Tr. 523–28). Four years later, Dr. Gonzalez affirmed his earlier responses to the survey. *Id.* (citing Tr. 1232–33). The ALJ accurately summarized Dr. Gonzalez's survey responses as indicating that Diektrich:

- has a mental impairment [that was] not due to a general medical condition causing significant distress or impairment in social, occupational, or other important areas of function;

- [was] limited in performing work on a full-time and ongoing basis;

- ha[d] psychologically-based symptoms while on medication, and would be unable to maintain regular attendance and be punctual . . . ;

- would miss ten or more days of work per month;

- would miss entire work days on these days;

- could not complete a workday without psychologically-based symptoms at a consistent

17

> pace without an unreasonable number and length of rest periods;
>
> - would lose greater than fifty-percent of the workday or workweek;
>
> - would not respond appropriately to supervisors and co-workers greater than fifty-percent of the time;
>
> - could not respond to usual work stresses and situations greater than fifty-percent of the time;
>
> - could not respond to changes in a routine work setting while on medication.

*Id.* Dr. Gonzalez indicated that his findings were consistent with his clinical notes. *Id.* However, the ALJ observed that Dr. Gonzalez did not explain any of his survey-response findings, and he observed that the findings were contradicted by Dr. Gonzalez's own clinical evaluations on ten different occasions between January 2019 and December 2022. *Id.* (citing 430–31, 437–38, 454–55, 461, 518, 522, 555, 1376, 1576, 1683–84, 2172–73).

Four different SAPCs reviewed Diektrich's medical records and evaluated the severity of Diektrich's mental impairments, including the paragraph B criteria discussed above. In April 2019 and June 2019, respectively, Dr. Murphy and Dr. Sharifian found Diektrich's mental impairments non-severe. Tr. 89, 101. In contrast, in December 2020 and March 2021, respectively, Dr. Castro and Dr. Kravitz found that Diektrich's mental impairments were severe. Tr. 698, 718. The ALJ noted that Diektrich has continued to seek treatment and medication for his mental health problems. Tr. 594. Therefore, as to the severity of Diektrich's mental impairments, the ALJ did not find the opinions of Dr. Murphy or Dr. Sharifian to be persuasive, but he found Dr. Castro and Dr. Kravitz's opinions persuasive. *Id.*

As to the paragraph B criteria, Dr. Kravitz found that Diektrich could understand, remember, and carry out simple

instructions; attend and concentrate for two-hour periods; interact adequately with co-workers and supervisors on a brief and superficial level; and respond appropriately to changes in a routine work setting. Tr. 712–31. Dr. Castro found that Diektrich could understand, remember, and carry out detailed, but not complex, instructions; make decisions and concentrate for extended periods; interact appropriately with others; and respond to changes in work settings. Tr. 693–710. The ALJ noted that Dr. Kravitz and Dr. Castro each cited a 2020 treatment note and Diektrich's own reports as the basis for their opinions. Tr. 594 (citing Tr. 693–710, 712–31). The ALJ found that Dr. Kravitz's opinion limiting Diektrich to simple work was persuasive because of his history of mental problems and treatment. Tr. 594–95 (citing Tr. 382, 430–31, 436–39, 500, 554, 1311, 1371, 1570, 1628–30, 1576, 1683–84). The ALJ also found Dr. Castro's opinion as to Diektrich's social function was supported. Tr. 595. The ALJ acknowledged that while Diektrich testified that he has difficulty interacting with others (particularly in crowds), the record shows that Diektrich has repeatedly been described as cooperative and polite with good eye contact. *Id.* (citing Tr. 430, 437, 454, 518, 555, 1376, 1683, 2172). The ALJ did not otherwise find Dr. Kravitz and Dr. Castro's opinions to be persuasive. *Id.*

The ALJ also reviewed opinions related to Diektrich's physical function. Tr. 595. The four opinions by State Agency Medical Consultants (SAMCs) found that Diektrich was limited to medium work. Tr. 85–94, 96–107, 693–710, 712–31. One of Diektrich's treating physicians at the VA, Dr. Charles Hachem, opined that Diektrich had no physical activity restrictions. Tr. 1692. The ALJ observed that Diektrich's medical records reflected some physical limitations, as described above. Tr. 595 (citing Tr. 333, 388, 402–03, 1344–45, 1629–30). Accordingly, the ALJ found that Dr. Hachem's opinion was not persuasive. *Id.*

19

The ALJ also found that the four SAMC opinions were not persuasive, as Diektrich's physical limitations limit him to light, not medium, work. *Id.*

There were other statements in the record do not qualify as opinions, so the ALJ did not analyze their consistency or supportability, although he did consider the statements themselves. Certain VA medical records addressed the VA's view of Diektrich's disability, but that question is left to the Commissioner to determine under the Commissioner's rules and criteria, which are different from the VA's. Tr. 595–96; *see* 20 C.F.R. § 1504. While the ALJ did not evaluate the persuasiveness of the VA's disability determination, he did consider the supporting evidence underlying the decision, including all of the medical evidence from the VA. Tr. 595–96.

The ALJ also considered a July 2015 disciplinary note from Diektrich's former employer. Tr. 596 (citing Tr. 301–03). The note cites Diektrich's failure "to follow instructions and report information despite being given several reminders." *Id.* The ALJ found that the note did not reflect mental or physical impairments or an inability to get along with others. *Id.* The ALJ found that that conclusion was supported by Diektrich's medical records, as his clinical evaluations for mental health did not reflect a cognitive limitation that accounted for his failure to follow procedure at work, and they did not show that Diektrich had limited interpersonal function. The ALJ noted that Diektrich's medical records showed that he is cooperative with good eye contact, and that he had good social support. *Id.* (citing Tr. 1376, 1576, 1683, 1686). The ALJ concluded that the disciplinary note was not a medical source opinion, and it was not probative in light of Diektrich's medical record. *Id.*

The RFC was determined according to the appropriate legal framework and is supported by substantial evidence. Each of the

physical and psychological limitations is supported by the record. The ALJ considered all of the evidence in the record and weighed its credibility. While Diektrich testified about and reported to his medical providers many disabling symptoms, the ALJ did not credit all of his statements. The ALJ properly considered the consistency and supportability of the medical opinions in the record and explained his evaluation of their persuasiveness, as required by 20 C.F.R. § 404.1520c. The ALJ also properly considered all of the objective medical evidence in the record, including Diektrich's many normal or near-normal mental status exams. The ALJ then concluded that while the evidence showed that Diektrich had mental and physical limitations through the date he was last insured, those limitations were not as severe as Diektrich asserted. These facts fully support the RFC.

Diektrich makes numerous arguments about the ALJ's alleged failure to impose mental limitations in the RFC based on his finding that Diektrich had "mild" or "moderate" limitations in all four of the paragraph B areas. ECF No. 11 at 18–29. The ALJ found that Diektrich had a "mild" limitation in three of the paragraph B functional areas, and a "moderate" limitation in the fourth area—his ability to concentrate, persist, and maintain pace. Tr. 588–89. It is apparent that the ALJ did account for his "moderate" limitation finding by limiting Diektrich to simple tasks at a non-production rate.

The three mild limitation findings, under the regulations, are just that—a finding that Diektrich is only *slightly* limited in those areas. Listing § 12.00(F)(2)(b). Many cases stand for the proposition that the ALJ does not have to find a work-related functional limitation in the RFC simply because he finds a "mild" or "moderate" limitation in the paragraph B criteria. *See, e.g.*, *Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013) ("The ALJ was under no obligation to include limitations in social functioning

21

in [the claimant's] RFC based solely on his finding that she had 'moderate difficulties' in social functioning as part of the distinct step-three analysis."); *Gunderson v. Astrue*, 371 F. App'x 807, 809 (9th Cir. 2010) ("[T]he ALJ is not required, as a matter of law, to include all the limitations from the impairments the ALJ deems to be severe at step two in the ALJ's final RFC analysis."); *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1228–29 (9th Cir. 2009) ("[The claimant] offers no authority to support the proposition that a severe mental impairment must correspond to limitations on a claimant's ability to perform basic work activities.").

Moreover, each of the paragraph B criteria have many underlying aspects. See Listing § 12.00E (describing the criteria and which abilities each area of mental function refers to). The ALJ read Diektrich's medical records and each individual finding by the experts. He did not just rely, in general, on a categorical label placed on one of the paragraph B criteria by one doctor. For example, while Dr. Castro found Diektrich had a moderate limitation in his ability to interact with others, that appears to be based solely on the finding that Diektrich was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 698, 706. In addition to that finding, Dr. Castro made may others, in which she found no limitations at all, including in Diektrich's ability to interact appropriately with the general public and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 705–06.

The ALJ's conclusions appear to be based on a thorough reading of the records. Plaintiff has failed to demonstrate that he is more limited than the ALJ found. He points to no evidence that the ALJ credited that would require further limitations. The record is replete with evidence supporting the RFC.

Diektrich assigns numerous errors in connection with the ALJ's evaluation of Dr. Castro's opinion by comparing Dr. Castro's opinion with that of Dr. Gonzalez. ECF No. 11 at 22–27. Dr. Gonzalez's survey response indicated that Diektrich was much more limited than did Dr. Castro's evaluation. *Contrast* Tr. 523–28, *with* Tr. 693–710. The ALJ rejected Dr. Gonzalez's opinion as not persuasive, as he concluded that it conflicted with the objective medical evidence, including Dr. Gonzalez's own treatment notes. Tr. 593. Diektrich does not argue that the ALJ's rejection of Dr. Gonzalez's opinion was incorrect. He points to no objective medical evidence that contradicts the ALJ's finding that the opinion was not persuasive. The ALJ's consideration of Dr. Gonzalez's opinion was within the requirements of the regulations, and it appears to be without error. Thus, Diektrich's reliance on Dr. Gonzalez's opinion to undermine the ALJ's evaluation of Dr. Castro's opinion is misplaced.

Diektrich argues that the ALJ failed to consider the evidence underlying the VA's disability decision. ECF No. 11 at 26–27. While the ALJ is not bound by the VA's decisions or administrative findings, the evidence underlying the decision is evidence that the ALJ may, and should, consider. However, Plaintiff has not cited any evidence within the VA record that the ALJ failed to consider. Under Rule 5 of the Supplement Rules of Social Security, "A brief must support assertions of fact by citations to particular parts of the record." Fed. R. Civ. P. Supp. R. 5. Moreover, the ALJ specifically acknowledged the VA's disability determination and stated that he considered all of the evidence underlying the decision. Tr. 595–96. The court has no reason to doubt the ALJ's representation. *See e.g.*, *Brunson v. Astrue*, 387 F. App'x 459, 461 (5th Cir. 2010) (finding no reason to dispute the ALJ's assertion that his decision was based on "careful review of the evidence"); *Robinson v. Saul*, No. 19-2695, 2020 WL 4480872, at *4 (S.D. Tex.

23

July 14, 2020) ("As long as the decision is supported by substantial evidence, the Court accepts the ALJ's representation that he 'carefully considered the evidence of record in its entirety.'").

The court finds no error—legal or factual—in the ALJ's RFC assessment.

### E. Step Four

At step four, the ALJ determines whether the claimant can perform jobs they previously worked by comparing the RFC determination with the demands of the claimant's past relevant work. 20 C.F.R. § 404.1520(f); *see also Perez*, 415 F.3d at 462. If the claimant can perform their past work, they are not disabled. 20 C.F.R. § 404.1520(f). If the claimant cannot perform their past work, the ALJ proceeds to step five. *See* 20 C.F.R. § 404.1520(g)(1).

The ALJ posed a hypothetical to the VE during the hearing that contained all of the limitations in the RFC that the ALJ ultimately found. Tr. 661. The VE testified that a person of the same age, education, past work history, and limitations as the claimant, through the date Diektrich was last insured, could perform his past work as a parking lot enforcement officer. *Id.* Based on that testimony, the ALJ found Diektrich was not disabled through the date he was last insured, and for MQGE benefits, through December 31, 2022. Tr. 597–98.

Because the VE's testimony was based on the ALJ's hypothetical question that incorporated all the limitations reasonably recognized by the ALJ, and because Diektrich's attorney had the opportunity to cross-examine the VE, the VE's testimony is substantial evidence supporting the ALJ's step-five determination. *See Masterson v. Barnhart*, 309 F.3d 267, 273–74 (5th Cir. 2002) (holding that the ALJ properly relied on the VE's testimony because the ALJ "scrupulously incorporated" all the

24

limitations "supported by the evidence and recognized by the ALJ" and gave an opportunity for cross examination).

This finding is supported by substantial evidence and is not in error.

### F. Step Five

At step five, the ALJ determines whether the claimant can perform any other work by considering the claimant's RFC and other factors, including age, education, and past work experience. *Schofield*, 950 F.3d at 318 (quoting 20 C.F.R. § 404.1520(a)(4)(v)). If the claimant can perform other work available in significant numbers in the national economy, the claimant is not disabled. *Id.* (citing 20 C.F.R. § 404.1520(g)).

The ALJ found that Diektrich could perform jobs that exist in significant numbers in the national economy. Tr. 597. As such he found Diektrich to be not disabled. Tr. 597–98. The ALJ relied on the VE's testimony that an individual of Diektrich's age, education, work experience, and RFC would be able to work as a price marker, office helper, or router, as of the date he was last insured, and as of December 31, 2022. Tr. 597, 661.

As was the case in step four, because the VE's testimony was based on the ALJ's hypothetical question that incorporated all the limitations reasonably recognized by the ALJ, and because Diektrich's attorney had the opportunity to cross-examine the VE, the VE's testimony is substantial evidence supporting the ALJ's step-five determination.

Accordingly, the ALJ's findings at step five are supported by substantial evidence and are not the product of legal error.

### 4. Conclusion

The ALJ's decision denying social security benefits is consistent with the law and supported by substantial evidence.

25

There is no genuine issue of material fact, and summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c).

Accordingly, the court **RECOMMENDS** that Diektrich's Motion for Summary Judgment, ECF No. 11, be **DENIED**; that the Commissioner's Cross-Motion for Summary Judgment, ECF No. 19, be **GRANTED**; and that the Commissioner's final decision be **AFFIRMED**.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas, on March 2, 2026.

_____
Peter Bray
United States Magistrate Judge

26